UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA

V.                                                          CASE NO.     1:19-mj-20702-CR-
                                                                         MARTINEZ/OTAZO-REYES
HANSON RICHARD LARKIN,
        Defendant.
_____/

**<u>DEFENDANT HANSON LARKIN'S SENTENCING MEMORANDUM AND REQUEST
FOR VARIANCE FROM ADVISORY SENTENCING GUIDELINES</u>**

COMES NOW, the Defendant, Hanson Richard Larkin, by and through his undersigned counsel of record, Michael H. Lambert, Esquire, and hereby submits the following Sentencing Memorandum and request for variance from applicable guideline range. This memorandum is being filed pursuant to Rule 32 of the Federal Rules of Criminal Procedure.

    **I.**    ***BOOKER*** **AND 18 U.S.C. §3553(A)**

The decision of the United States Supreme Court in *Booker* has rendered the United States Sentencing Guidelines "effectively advisory." *U.S. v. Booker*, 125 S. Ct. 738, 759-67 (2005). Pursuant to *Booker,* sentencing courts are required to consider a Defendant's guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* at 767 *(citing* 18 U.S.C. §3553(a)).

In present day sentencing, the guidelines have been relegated to their namesake, that is, simply to act as a guide in an otherwise complex sentencing matrix. District courts are now free to individualize sentences based upon factors enumerated in U.S.C. §3553(a)(1).

1

The sentencing factors that the court must consider as a result of *Booker* are seven in number and set forth as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) [the applicable Sentencing Guidelines];

(5) any pertinent [Sentencing Guidelines] policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victim of the offense.

Title 18, United States Code, §3553(a) and the "parsimony provision" mandate that the district court "impose a sentence sufficient but not greater than necessary," to comply with the purposes of sentencing set forth in §3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed in 18 U.S.C. §3582, which recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

While the Court must properly consider the guidelines, it may fashion a sentence below the

guideline recommendation as is warranted and as the dictates of justice so require. See *Kimbrough v. U.S.*, 85, 128 S. Ct. 558 (2007). Moreover, any variance does not require any heightened evidentiary foundation to support it and given all of the unusual and distinguishable facts and circumstances of this case, a sentence of 12-18 months imprisonment is not necessary for the district court to "impose a sentence sufficient, but not greater than necessary" to effectuate the intent and purpose of the sentencing guidelines. 18 U.S.C. §3553(a).

Section 3553(a) factors provide strong justification for a sentence below that range and for a sentence of supervised release for the reasons set forth below. Consequently, Hanson Larkin requests a downward variance.

**II.     APPLYING THE FACTORS CONTAINED IN 18 U.S.C. §3553(a)**

**A.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

*Circumstances of the Offense*

Mr. Larkin entered a plea of guilty to the single count Information: Transmitting Threatening Communications in Interstate Commerce, in violation of 18 U.S.C. §875(c) (PSR @ 1, ¶ 3). The facts surrounding the charge reflect that for well over two years Hanson Larkin and L.R. communicated with one another via text message, telephone, Facetime, and other various social media outlets. (PSR @ 4, ¶ 7) As a result, and at a minimum, a friendship existed between the two. Little is provided as to L.R.'s age, background, sexual orientation, etc.

As is evident by its absence, the Defendant, Hanson Larkin, was unemployed during the period of this friendship, except for the latter part of 2019. That employment was obtained through "Two-6 Resources", a mental health outreach resource center (PSR @ 12, ¶ 54). The resource center

3

assisted in obtaining for Hanson Larkin a job at Walgreens in Debary, Florida, where he stocked the shelves. His hourly rate was $9.00, and his work ethic and functioning capability periodically reviewed with Walgreens by "Two-6 Resources". Excited because he had obtained employment which generated some self-worth, Larkin contacted L.R. to let him know of his desire to come to the Miami-Dade area and physically meet L.R., as he would soon have the wherewithal to independently pay for such a trip. L.R. expressed his disapproval of such an occurrence. (PSR @ 5, ¶ 8) In text messages beginning August 2, 2019, Larkin questioned L.R. about coming and L.R. repeatedly expressed his desire and request that there be no such meeting. (PSR @ 5, ¶ 9)

Despite L.R.'s protestations to the contrary, on August 24, 2019 Hanson Larkin traveled via Amtrak from Deland to Miami. (PSR @ 5, ¶ 12) Throughout his travel he continued to text L.R. that he was on his way and later, on August 25, 2019, that he was outside L.R.'s residence, knocking on the door. (PSR @ 5, ¶ 10) L.R. lives with a number of family members, though he was not at home when Larkin claimed to be at the residence. In fact, Larkin was not at the residence, but rather sitting at a table of an outside restaurant approximately five miles away.

Overwhelmed with pride in the fact that he had independently earned enough money to travel to the Miami area, provide himself with meals, and a hotel, Larkin wanted to physically see L.R. and exhibit his pride and self-perceived independence.

Occasionally during his more than two years of conversations with L.R., Hanson Larkin has expressed a hatred and disdain for Jews. (PSR @ 5, ¶ 7) The Hanson Larkin rationale for that feeling was that as a child he had been both physically and mentally bullied by a Jewish boy and, when receiving treatment for his mental health maladies, one of his psychiatrists, who was the only one at that time, not only prescribed medication that caused Larkin to gain over 100 pounds and

caused male breasts because of the hormonal constitution of the medication, was Jewish. (PSR @ 10, ¶ 44) Additionally, this psychiatrist, in treating Larkin, would often make fun of him and once to such a degree that his mother, who was present, decided that they would no longer utilize the services of this psychiatrist.  Over the years, Hanson Larkin lost well over 100 pounds as his medication had changed; however, his body still reflects the scars created by the stretchmarks from being so overweight.

The extended Larkin family and friends, includes Jews.  He has an aunt that is Jewish, and some of his parent's friends were Jews as well.  Never had there been any type of an outbreak or even impoliteness by Hanson Larkin towards these family members and friends.

The threats made by Larkin to a generic "Jews" were solely typed and intended to get L.R. to meet him in person. (PSR @ 5, ¶ 12) Larkin knew that L.R. would take them seriously and in Larkin's mindset, cause L.R. to agree to meet with him.  In his state of mind, Larkin never completed the equation that these statements would result in L.R. seriously believing that Larkin would physically locate and hurt a Jewish person.  Hanson Larkin has never possessed, touched, let alone owned a firearm.  Since the threat made by Larkin was generic in its nature as to "Jews", with no specific individual, synagogue, or Chabad, when L.R. notified law enforcement, there was no individual or synagogue to notify.

In that Larkin never heard back from L.R., he went to the Butterfly Museum that was near him, spent the night in a hotel nearby, then got on the Amtrak train returning to Debary, Florida, where he was picked up by his father and returned to his residence.

From a law enforcement perspective, it became imperative to locate Hanson Larkin.  That occurred on August 26, 2019, when he was back at work and the FBI came to Walgreens to talk with

him. Because of Larkin's demeanor and verbal expressions, law enforcement had him committed to a mental health facility where he remained, was treated, and his mental health and emotional stability restored so that he could be physically arrested for this offense. (PSR @ 11, ¶ 46)

With the consent of Larkin's father, law enforcement did a cursory search of the residence and located no firearm, but a bb gun which was left at the residence, and picked up by a separate and distinct law enforcement agency at a later date.

Research of all data producing agencies revealed that Hanson Larkin has never purchased a firearm. No investigative technique by law enforcement revealed that Hanson Larkin ever possessed a firearm.

Though intent is not a component of this prosecution, contained within the factual basis to support the plea is the unusual and exceptional reason, purpose, and intent within Hanson Larkin's mind when he made his veiled threat against Jewish people. The threat was never forthright, rather building blocks:

(A)  "I bought a gun with my first paycheck. If I don't meet you I will be forced to use it.";

(B)  "I told you how much I hate Jews, right?";

(C)  "If meeting me for 5 seconds is not worth the lives of multiple Jews, then I have no option.";

(D)  "There is a Chabot near me. And Amtrak has no security for weapons. Don't make me make a choice they'll regret.";

(E)  "So then we meet and no dead Jews?". (PSR @ 5, ¶ 11)

Again, it was through the mind of Hanson Larkin that by these expressions, L.R. would physically meet with him. Nothing more.

*History and Characteristics of Hanson Larkin*

While detained in federal custody, Hanson Larkin turned age 26. (PSR @ 35, ¶ 8) Having been born, along with his twin sister Martha, to Cynthia Stevans and Harry Larkin on October 12, 1993 in Pittsburgh, Pennsylvania, the family remained until 2017 when then 24 year old Hanson Larkin and his father Harry moved to Deland, Florida. (PSR @ 8 ¶ 35, 36)

Larkin was arrested by law enforcement on September 6, 2019 and has remained detained since, whether it be in Orlando, Florida, or his eventual transfer to Miami. While detained, Larkin's 72 year old father passed away. (PSR @ 8, ¶ 35) Larkin and his father had become close having spent the last year and a half together alone in the family home in Deland, Florida, while his mother remained a teacher at Penn State University, where she intended to remain until she turned age 65 and could obtain her social security and move to the family residence in Deland, Florida.

At age 9, Hanson Larkin was diagnosed with a number of mental health diseases: Asperger Syndrome (AS), Major Depressive Disorder, Attention Deficit Disorder, Bipolar Disorder, and Anxiety Disorder. (PSR @ 9, ¶ 41) Despite these diseases, his parents felt it was best to keep Hanson socialized so he was kept in public schooling.

Having been bullied at school and expelled as a result, his mother punished him for being "kicked out of school". (PSR @ 9, ¶ 42) As a result of the incident coupled with the punishment, Hanson took a number of his mother's anti-depressants in an effort to kill himself. He was hospitalized and then placed into a mental health children's hospital. (PSR @ 9, ¶ 42) At that facility, Hanson was beaten up, so his father removed him. (PSR @ 9, ¶ 42) Thereafter, Hanson was in and out of many mental health facilities, each a lockdown facility and incapable of being released until authorized by a psychiatrist. (PSR @ 9, ¶ 42) In addition to each of the noted mental health

7

maladies, his records also reflect very poor to low self-esteem. (PSR @ 10, ¶ 43)  Though he has, and is proud of a high school diploma, it was not earned via attending a public high school on a regular basis with other students.

Larkin's parents felt that his mental health maladies were their responsibility, so he remained home when not institutionalized.  It was during this time that Hanson was being treated by a Jewish psychiatrist who prescribed a medication that contained hormones that caused him to gain over 100 pounds and grow breasts.  He found both of these extremely embarrassing and humiliating.  He was informed that it was a side effect that he was going to have to accept.  Mrs. Stevans terminated his treatment with the psychiatrist when she experienced the verbal abuse exerted upon her son by this doctor.

At the age of 24, and feeling that he had nothing to live for, was going nowhere, and was but a drain upon his parents, Hanson Larkin, for a second time attempted suicide by taking his father's vehicle without permission, driving it to an extension bridge in the city of Pittsburgh, where he jumped off into its icy waters believing it would give the relief that death would bring. (PSR @ 10, ¶ 44) He survived and it was at that point that his parents decided that his father would move to the Deland, Florida area and purchase a home which would be occupied by him and his father until his mother was able to retire from her job at Penn State at the age of 65.

Because of his Asperger's Syndrome, Hanson, to this date, has very poor, if any, social skills.  His personal hygiene skills are deplorable.  After high school, and while living in Pittsburgh, Hanson recalls, as does his mother, a limited period of employment where he helped a friend doing janitorial work at an airport.  (PSR @ 12, ¶ 55)

Hanson's day-in and day-out activity has been the internet and video games.  From many of

those games he has obtained a peculiar vocabulary that is rarely used.

To his credit, he has self-taught the Japanese language and piano classics, and computer skills. (PSR @ 12, ¶ 57)

On August 28, 2019, local police officers, at the request of the FBI, Baker Acted Larkin. He was treated there 10 days until he was eligible for discharge to law enforcement. His diagnosis at the time was Bipolar II Disorder and Major Depressive Disorder. (PSR @ 11, ¶ 46) The medications given to Larkin while housed at the Stewart Marchman facility were Lexapro 10mg., Lithium 300mg., and Trazadone 150 mg. (PSR @ 11, ¶ 46) These were given via injection. According to his parents, they had never seen him so competent and together during that treatment. Thereafter, Larkin was detained in Orlando, Florida, where a detention hearing occurred that was presided over by U.S. Magistrate Judge Gregory J. Kelly who hearing all of the testimony stated that Larkin did not need to be in a detention facility with federal inmates, but rather at a mental health facility, seeking the assistance of the Office of Federal Parole and Probation in doing so. Those efforts hit a stone wall when Probation responded that there existed no such facility, so Larkin was further detained, as he is now, with other federal inmates awaiting transfer, trials, hearings, or sentencing.

Since the age of 21, Larkin, who has been determined 100% disabled by Social Security disability, as a result of his mental health maladies which were not self-imposed, received $800 per month until his detention in this case. (PSR @ 12, ¶ 52, 53) His detention in this case having lasted over 60 days has now not only removed him from his social security benefits, but also from the mental health assistant roles as his last mental health providers Choices Mental Health and Steward Marchman Healthcare have not been able to be in contact with him.

Hanson Larkin will be readmitted to mental health care and the return of his $800 per month Social Security disability, but only after approximately 30-60 days and his ability to physically appear at, and reestablish his acceptance and treatment into those facilities.

Hanson Larkin has never had a girlfriend or a boyfriend. While institutionalized, he was the recipient of anal intercourse, and as a result believes that he is homosexual. He has had no subsequent contact with a male or female.

As does each one of us, Hanson Larkin craves to have a relationship with someone. Though he wants to be loved and even married, to him it is impossibility. Though distant, and only through text messages, telephone conversations, and various social media outlets, he believed that he had established all but the physical portion of a "contact" with L.R. who, though somewhat older, was always kind, caring, and helpful to him. The frustration in foreclosure of that perceived contact drove Larkin's compromised emotions and thought process to the illegal, offensive, constructive text threats that he typed. Again, the sole purpose in his mind was that they would cause L.R. with whom he had been sharing sensitive information back-and-forth for well over two years.

### III. VARIANCE REQUEST AND SUPPORT THEREOF

First it must be determined whether or not under the unique facts and circumstances of this case coupled with Hanson Larkin's conditions there exists, to an unusual and distinguishable degree from the typical cases covered by the guidelines support for a variance under 5H1.3 "Mental and Emotional Conditions". Before this or any other variance request may even be considered, it must be determined whether or not the totality of these unique and rarely coupled circumstances truly present a crime of violence. If so, this variance requested then foreclosed.

Hanson Larkin has no prior criminal history. Hanson Larkin's employment history is minimal and one that would need to be supervised through an agency such as 2-6 Resources until it were determined that he could work outside such parameters.

Pursuant to USSG Section 5K213, the Court may downwardly depart if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Here too it must be determined whether or not under the unique totality of the circumstances herein, Hanson Larkin's offense is one of violence. Right after the incident, and having been contacted by law enforcement, law enforcement felt Larson needed to be committed under the Baker Act as a threat to himself. His demeanor and behavior exhibited a fear that he would hurt himself. Normally, a patient without need would be released within no more than 72 hours of being placed in such a facility. Instead, Hanson Larkin remained in the mental health facility until cleared by the doctors some 10 days later.

Under USSG Section 5K2.20 "Aberrant Behavior", a downward departure may be warranted in an exceptional case if:

>   (1) the defendant's criminal conduct meets the requirements of subsection (b); and
>
>   (2) the departure is not prohibited under subsection (c).

(B)     REQUIREMENTS – The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or a single criminal transaction that:

>   (1) was committed without significant planning;
>
>   (2) was of limited duration; and
>
>   (3) represents a marked deviation by the defendant from an otherwise law abiding life.

The policy provision is prohibited based upon the following:

(c) PROHIBITIONS BASED UPON THE PRESENCE OF CERTAIN CIRCUMSTANCES – The court may not depart downward pursuant to this policy statement if any of the following circumstances are present:

(1) the offense involved serious bodily injury or death;

(2) the defendant discharged a firearm or otherwise used a firearm or dangerous weapon;

(3) the offense of conviction is a serious drug offense;

(4) the defendant has either of the following:

(A) no more than one criminal history point, as determined under A1.3 (departures based on inadequacy of criminal history category); or

(B) a prior federal or state felony conviction or any other significant criminal history behavior, regardless of whether the conviction or significant prior criminal behavior is countable under Chapter C4F.

While in detention awaiting disposition of his case, the Defendant has attempted suicide. Despondent and with feelings of hopelessness, the Defendant fears that as a result of his effort to physically see L.R., which he now comprehends was unlawful and illegal, that he will spend the rest of his life in prison despite being informed that the maximum sentence he could receive would be five (5) years and that the advisory recommendation is anywhere from 12 to 18 months of incarceration.

Undersigned counsel is placed in a very unique and peculiar position. Not unlike that of representing a juvenile in a state court proceeding which is not only entitled "In Re The Interest of _____", that nomenclature is also the pronounced purpose of not only the proceeding, but the

parties intended result. Here, undersigned counsel deals with a mentally constrained client who is competent, though often limitedly.

The Defendant's courtroom behavior initially perplexed the Honorable Gregory J. Kelly at the detention hearing; however, as the hearing progressed, he began to understand and appreciate that much of the Defendant's behavior - abruptly standing up, remaining upright though head completely down, to the Defendant placing his head on the defense table, was the involuntary product of his mental health diseases. Again that entire proceeding resulted in the magistrate requesting that an alternative to incarceration be presented by both the government and the pretrial services of the Office of Parole and Probation. The Orlando part of the U.S. Attorney's Office acquiesced to the Office of Parole and Probation, which informed the Court that no such facility existed. To his dismay, the Honorable Gregory J. Kelly directed Hansen Larkin be detained but solely because of the fear that he may hurt himself, no other.

At his first appearance here in Miami, that judge too questioned Hansen Larkin's competency based upon his behavior. Again counsel confirmed that though limitedly, Larkin was, and is, competent.

At his arraignment, Larkin's behavior was again questioned by the Court as to whether or not it reflected incompetency. Again counsel confirmed that Larkin is competent.

This Court too has, on limited basis, seen, and most likely noted, Larkin's often peculiar behavior. Undersigned counsel has practiced law in the criminal arena for well over four (4) decades. Not only has he represented many clients suffering Larkin's diseases, though not in the identical combination, but he has family members who do so suffer. As a result, though not other than life experience qualified, he can perceive, appreciate, and accept the actions and behavior of those

similarly situated, as well as Larkin himself.

As a result, in addition to the variances sought, subject to their applicability, counsel further seeks on behalf of Hansen Larkin, that his supervised release contain mandated participation in mental health programs under *USSG §5B1.3(d)(5) and 5D1.3(d)(5)*.

The "Catch-22" that everyone is now subjected to is that as a result of his pretrial detention Larson has lost his social security payments of $800.00 a month, as well as his acceptance into mental health facilities covered by the State due to his absence from any continuing designated mental health facility for 60 days. Though I do not believe anyone intended to place Hansen Larkin in a position where he would be deprived of the very assistances his mental health diseases mandate, and ironically that which the Honorable Gregory J. Kelly sought in lieu of pre trial detention, that is where we find ourselves. As is evidenced by his $36.00 net worth, his family's incapability of paying for a private mental health facility, undersigned counsel was unable to locate any facility that would accept Larkin under these circumstances. However, the Stewart Marchman facility in Volusia County, Florida, as well as the Choices Facility with which it is affiliated, are willing to accept Larkin once he is reapproved which they indicated would take approximately 30-60 days post personal application. Based upon the facts and circumstances of Larkin's removal from mental health assistance, those 30-60 days of waiting would be filled with him receiving the medications that he needs. As previously noted, while awaiting restoration at the Stewart Marchman facility, each of those medications were administered via a shot. It has been undersigned counsel's experience that providing shots, and lieu of oral medication in hopes that it will be taken, reaches a consistent result.

A downward variance by this Court would permit the remainder of the Court's sanction under supervised release coupled with the mandated need for psychiatric and psychological treatment.

14

The Defendant requests a downward variance in the sentencing guidelines to a sentence that permits immediate supervised release to include mandated psychiatric and psychological counseling consistent with that which he received prior to his detention. That while on supervised release, he live with his mother in their Deland, Florida home.

WHEREFORE the Defendant prays that the Court sentence the Defendant to a term of incarceration consistent with time served and the remainder of a sentence the Court deems appropriate on supervised release with special conditions.

Respectfully submitted,

**LAMBERT LAW**

/s/ Michael H. Lambert

_____
**MICHAEL H. LAMBERT, ESQUIRE**
Florida Bar No. 0188156
**BRYAN G. LAMBERT, ESQUIRE**
Florida Bar No. 0097988
428 North Halifax Avenue
Daytona Beach, Florida  32118
(386) 255-0464
Office@LambertLaw.us

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 27, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to the following:

    Edward Stamm, Assistant U.S. Attorney
    Edward.Stamm@usdoj.gov
    Maria Medetis, Assistant U.S. Attorney
    Maria.Medetis@usdoj.gov
    99 NE 4th Street, 8th Floor, Miami, Florida  33132-2131

Respectfully submitted,

**LAMBERT LAW**

/s/ Michael H. Lambert

_____
**MICHAEL H. LAMBERT, ESQUIRE**
Florida Bar No. 0188156
**BRYAN G. LAMBERT, ESQUIRE**
Florida Bar No. 0097988
428 North Halifax Avenue
Daytona Beach, Florida  32118
(386) 255-0464
Office@LambertLaw.us