1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2               ORLANDO DIVISION

3                                    :
                                     :
4   UNITED STATES OF AMERICA,        :
                                     :    Case No.:
5        Plaintiff,                  :    6:19-mj-01626-LRH-1
                                     :
6   v.                               :    Orlando, Florida
                                     :    September 10, 2019
7                                    :    10:16 A.M.
                                     :
8   HANSON RICHARD LARKIN,           :
                                     :
9        Defendant.                  :
                                     :

10

11          TRANSCRIPT OF DETENTION HEARING
        BEFORE THE HONORABLE GREGORY J. KELLY
12          UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For the Plaintiff:              Emily C.L. Chang

15

16   For the Defendant:             Michael H. Lambert

17

18

19   Court Reporter:                Heather Jewett, RPR, FCRR
                                    heatherjewett.focr@gmail.com
20

21   Proceedings recorded by digital recording.
     Transcript produced by computer-aided transcription.
22

23

24

25

1

# T A B L E   O F   C O N T E N T S

2

**September 10, 2019**

3

WITNESSES FOR THE GOVERNMENT:

4

ANDREW MERCURIO
    Direct Examination By Ms. Chang      4
5
    Cross-Examination By Mr. Lambert      19

6

WITNESSES FOR THE DEFENDANT:

7

MARTHA LARKIN
    Direct Examination By Mr. Lambert      30
8
    Cross-Examination By Ms. Chang      38
    Redirect Examination By Mr. Lambert      41
9

HARRY R. LARKIN
10
    Direct Examination By Mr. Lambert      42
    Cross-Examination By Ms. Chang      49
11
    Redirect Examination By Mr. Lambert      51

12

COMPETENCY      53

13

ARGUMENT
    By Ms. Chang      55
14
    By Mr. Lambert      60

15

RULING OF THE COURT      62

16

17

FOR THE DEFENDANT:

18

Number 1      SEALED      55

19

20

21

22

23

24

25

1                           **P R O C E E D I N G S**

2                  (Call to order of the court at 10:16 A.M.)

3                  **THE COURTROOM DEPUTY:**    Case No. 6:19-1626, the United

4        States of America v. Hanson Richard Larkin.

5                           Counsel, please state your appearances for the

6        record.

7                  **MS. CHANG:**    Good morning, Your Honor.  Emily Chang on

8        behalf of the United States.  With me is Special Agent

9        Andrew Mercurio of the FBI.

10                 **THE COURT:**    Good morning.

11                 **MR. MERCURIO:**    Good morning, Your Honor.

12                 **MR. LAMBERT:**    Good morning, Your Honor.  My name is

13       Michael Lambert, and I'm here along with Hanson Larkin.

14                 **THE COURT:**    Good morning.  Nice to meet you.

15                 **THE DEFENDANT:**    Nice to meet you too, Judge.

16                 **THE COURT:**    All right.  This matter is set for a

17       detention hearing.  Are the parties prepared to proceed on

18       that?

19                 **MS. CHANG:**    Yes, Your Honor.

20                 **MR. LAMBERT:**    Yes, sir.

21                 **THE COURT:**    All right.  Does the Government maintain

22       that any presumptions apply?

23                 **MS. CHANG:**    There are no presumptions that apply.

24                 **THE COURT:**    All right.  Are you arguing risk of

25       flight, danger to the community, or both?

*Testimony of Andrew Mercurio*

1      **MS. CHANG:**    Both of them, Your Honor.

2      **THE COURT:**    Okay.  All right.  We'll hear from the

3  Government first, then.

4      **MS. CHANG:**    The United States calls Andrew Mercurio

5  to the stand.

6      **THE COURT:**    All right.  Agent, if you'll come forward

7  to the witness stand on your right.  Please remain standing to

8  be sworn.

9      **THE COURTROOM DEPUTY:**    Please raise your right hand.

10                    **ANDREW MERCURIO**

11  was called as a witness on behalf of the Government and, having

12  been duly sworn, testified as follows:

13      **THE WITNESS:**    I do.

14      **THE COURTROOM DEPUTY:**    Please be seated and state

15  your name for the record.

16      **THE WITNESS:**    Andrew Mercurio, spelled

17  M-e-r-c-u-r-i-o.

18      **THE COURTROOM DEPUTY:**    Thank you.

19      **MS. CHANG:**    May I proceed, Your Honor?

20      **THE COURT:**    Please.

21                    **DIRECT EXAMINATION**

22  BY MS. CHANG:

23  **Q.**    Agent, where do you work?

24  **A.**    I work for the Federal Bureau of Investigation,

25  Miami Division.

*Testimony of Andrew Mercurio*

1    Q.    And what do you do there?

2    A.    I'm a special agent assigned to a squad that investigates

3    public corruption matters as well as civil rights matters to

4    include hate crimes.

5    Q.    How long have you been working for the FBI?

6    A.    Since 2016.

7              MS. CHANG:    Your Honor, I'd request judicial notice

8    of Document 2, Attachment 1 in this case, which is the

9    complaint and affidavit.

10             THE COURT:    Any objection, Mr. Lambert?

11             MR. LAMBERT:    No, sir.

12             THE COURT:    All right.  The Court will do so.

13             MS. CHANG:    Thank you, Your Honor.

14   BY MS. CHANG:

15   Q.    Agent, did you draft the complaint affidavit?

16   A.    Yes.

17   Q.    Are its contents true and correct?

18   A.    Yes, ma'am.

19   Q.    Do you adopt its contents as your testimony today?

20   A.    Yes, ma'am.

21   Q.    Did you interview the victim in this case?

22   A.    We -- we did, yes.

23   Q.    So the next line of questions are all going to be based on

24   your interview with the victim.  So when did the victim meet

25   the defendant?

*Testimony of Andrew Mercurio*

1    **A.**    Approximately two to three years ago.

2    **Q.**    How did the victim and the defendant meet?

3    **A.**    They met online, ma'am.

4    **Q.**    And when you say -- when I say "meet," did they meet in

5    person or did they ever meet beyond online?

6    **A.**    To our knowledge, they only met online and conversed

7    online frequently.

8    **Q.**    And have the defendant and the victim ever met in person?

9    **A.**    No.

10   **Q.**    How did the defendant and the victim communicate during

11   the last two to three years?

12   **A.**    They would communicate in various mediums to include via

13   telephone, both text messaging and calls, also via different

14   chatting applications, such as Facebook Instant Messenger.

15   **Q.**    What was the nature of the victim's relationship with the

16   defendant?

17   **A.**    They were friends.  According to the victim, they became

18   close friends and would converse regularly about various

19   topics.

20   **Q.**    Did the victim get any sense, however, that the defendant

21   wanted to be more than friends?

22   **A.**    Yes.

23   **Q.**    And did the victim -- did the defendant tell the victim

24   that he was gay?

25   **A.**    Yes.

*Testimony of Andrew Mercurio*

1    **Q.**    What was the victim's response to his sense that the

2    defendant wanted to be more than friends?

3    **A.**    Well, they had initially met via a website in which gays

4    would communicate and converse.  The victim expressed that he

5    quickly identified that he wanted to just maintain friends with

6    the defendant, at which point the defendant would repeatedly

7    discuss his desire to come and meet with the victim, and the

8    victim expressed multiple times he didn't think that was a wise

9    idea because he knew what the defendant would be seeking.

10    **Q.**    Where did the victim live?

11    **A.**    The victim lived in the Miami area.

12    **Q.**    And where did the defendant live during his friendship

13    with the victim at least in the last two years?

14    **A.**    DeLand.

15    **Q.**    Did the defendant ever express a desire to -- well,

16    actually, you already talked about that.  How did the victim

17    view his role in the defendant's life?

18    **A.**    The victim saw himself as somewhat of a mentor.  He was

19    older, and he would frequently communicate with the defendant

20    and try and give him advice and encouragement, as the defendant

21    frequently expressed different sentiments that indicated he was

22    looking for friendship and -- and help.

23    **Q.**    What is the age gap between them?

24    **A.**    The victim is in his 40s, and the defendant is 25.

25    **Q.**    And why did the victim feel like he needed to be a life

*Testimony of Andrew Mercurio*

8

1    coach?  What was it about the defendant that made him feel

2    that?

3    **A.**    He said he felt bad for him.  The defendant expressed that

4    he didn't have any friends, that he was having a hard time.  He

5    repeatedly expressed thoughts of self-harm, and the defendant

6    would constantly try and uplift him and -- and give him

7    guidance and support.  He'd give him advice, like the need to

8    take care of -- better care of himself and not be so hard on

9    himself and get down on himself, and he kind of saw himself as

10   somebody that the defendant could look up to.

11   **Q.**    Did there come a time this year when the defendant

12   expressed plans to visit the victim in the Miami area?

13   **A.**    Yes, ma'am.

14   **Q.**    When was that -- or what were the circumstances

15   surrounding that?

16   **A.**    The defendant had repeatedly expressed an interest in

17   visiting the victim in the Miami area; however, he previously

18   did not have the means to do so.  Recently, however, the

19   defendant did obtain employment.  He expressed this to the

20   victim and repeatedly said that on several instances he

21   intended to use the money that he made from his job as a

22   mechanism to purchase a ticket and travel to the Miami area to

23   visit with the victim.

24   **Q.**    And what did the victim say on this most recent occasion

25   when the defendant said, "Hey, I want to come visit you"?

*Testimony of Andrew Mercurio*

1    **A.**    He told him it wasn't a good idea, and he said to save his

2    money, as now he learned that the victim had a means to

3    actually travel to Miami with the money he earned.  He told him

4    that he -- he knew that, in summary, there would be something

5    more that the defendant would want and that he didn't think it

6    was a good idea for the two to meet.

7               **THE DEFENDANT:**   No, no.

8    **BY MS. CHANG:**

9    **Q.**    Did there come a time when the defendant started to harass

10    the victim?

11    **A.**    Yes.

12    **Q.**    When was that?

13    **A.**    So the harassment increased over the past several weeks

14    leading up to August 25, 2019.

15    **Q.**    What happened on August 25th?  Did the defendant send a

16    particular text to the victim?

17    **A.**    He did.  He sent a text of the victim's home address

18    and -- and basically said, "Hey, I know where you live.  I'm

19    coming here now."

20    **Q.**    And how did the victim respond?

21         First of all, had the victim ever given the defendant his

22    home address?

23    **A.**    No.

24    **Q.**    And so how did this make the victim feel about the

25    defendant finding and then sending him the victim's own home

*Testimony of Andrew Mercurio*

1    address?

2    **A.**    When we interviewed the victim, he expressed that he felt

3    as if it had invaded his privacy, which was what he in summary

4    expressed to the defendant.

5    **Q.**    Did he feel any fear?

6    **A.**    Yes.

7    **Q.**    What did the defendant do next?

8    **A.**    The defendant sent a series of text messages that were

9    threatening in nature and coercive.  In summary, they expressed

10    that the victim needed to meet with the defendant; otherwise,

11    the defendant would be forced to take certain actions.  Those

12    text messages included threats that indicated he had purchased

13    a firearm.  He also went on to express a hatred for Jews and

14    threatened to conduct a shooting at a Chabad in the area if the

15    victim did not meet with him.

16    **Q.**    And with respect to the defendant saying that he had a

17    gun, did he say anything about the victim in fear that you

18    remember?

19    **A.**    I do.  The victim repeatedly was expressing -- this was

20    all via text message -- that he was in fear, and at one point

21    the defendant sent a text message that stated something to the

22    effect of "Come outside.  I want to smell your fear."

23    **Q.**    When you mentioned that the defendant threatened to commit

24    a shooting at a local Chabad, did the defendant describe a

25    particular synagogue?

*Testimony of Andrew Mercurio*

1    **A.**    He did not describe a particular synagogue but more so a

2    location.

3    **Q.**    Okay.

4    **A.**    He talked -- he talked about the fact that there is a

5    Chabad near him and that Amtrak had no security for weapons,

6    and he went on to say, "Don't make me make a choice they will

7    regret."

8    **Q.**    And is there a Chabad near the Amtrak station in that

9    area?

10   **A.**    Yes.

11   **Q.**    And when I say "the area," I mean the area of where the

12   victim lived.

13   **A.**    Yes.

14   **Q.**    Okay.  Did the defendant tell the victim where he was at

15   the time?

16   **A.**    Yes.  He said he was at the victim's residence.

17   **Q.**    And how did the victim respond?

18   **A.**    The victim told him he was going to call the police.  The

19   victim, in turn, did notify local law enforcement for fear of

20   his life.  The victim was not at home at the time, however did

21   express a significant amount of fear and -- and repeatedly

22   asked the defendant to return home and to return the gun.

23   **Q.**    Is there any indication that the defendant actually did

24   travel to the victim's residence and was actually near the

25   victim's home?

*Testimony of Andrew Mercurio*

1    **A.**     Yes, ma'am.

2    **Q.**     Explain.

3    **A.**     So we obviously wanted to corroborate the information that

4    was provided by the victim.  We annotated that the defendant

5    does not have a vehicle registered in his name in law

6    enforcement databases.  We, in turn, contracted -- contacted

7    Amtrak Police Department, who provided records that indicated

8    that the victim had purchased train tickets and traveled from

9    DeLand to the Miami area on August 24th and had returned home

10   to the DeLand area via train on August 26th.

11   **Q.**     Did the victim tell you about any other signs of the

12   defendant's mental stability or instability during his

13   friendship?

14   **A.**     Yes, ma'am.

15   **Q.**     Tell us about that.

16   **A.**     He talked about how the victim repeatedly expressed

17   thoughts of self-harm and -- and "ending it all," as he said.

18   He talked about an instance where the -- or, excuse me.  I

19   should say the defendant expressed thoughts about self-harm.

20   He talked about how the defendant had told him repeatedly in

21   different instances where he was thinking of killing himself

22   and taking his own life.

23   **Q.**     Did he have any particular means by which he ever

24   mentioned planning to do that?

25   **A.**     He talked about taking a bottle of Tylenol and swallowing

*Testimony of Andrew Mercurio*

1    all the pills to end it all.  There were other instances where

2    he talked about jumping off of buildings.

3    **Q.**    Had -- well, so you mentioned that the defendant had

4    expressed particular opinions about Jewish people during the

5    text messages.  Before the text messages from this last, you

6    know, ten days, had the defendant ever previously expressed

7    particular opinions about Jewish people to the victim?

8    **A.**    Yes.  The victim told us that the defendant had expressed

9    his hatred for Jews, and the victim believed that it stemmed

10   from an incident that had occurred in the defendant's youth, a

11   bad experience with either a teacher or a doctor that was

12   Jewish.  The victim counseled the defendant, told him, "You

13   can't hold one person" -- or "can't hold the brethren of an

14   entire race accountable for the actions of one person."

15   **Q.**    Is the victim actually part Jewish as well?

16   **A.**    He is.

17   **Q.**    Did the defendant know that?

18   **A.**    Yes.

19   **Q.**    What did the defendant say about that?

20   **A.**    The defendant said, "Well, you're one of the good ones."

21   **Q.**    Did the defendant ever tell the victim anything about the

22   defendant having been institutionalized before for mental

23   issues?

24   **A.**    He talked about how the defendant had expressed to him

25   that he'd been institutionalized previously.  He talked about

*Testimony of Andrew Mercurio*

1  how the defendant had a rough childhood and had been physically

2  abused by his mother, and as a result that had -- had spurned

3  some of the reasoning for why the defendant hated women and

4  also had become gay.

5  **Q.**  As far as going back to the institutionalization, did he

6  say how many times he had been institutionalized?

7  **A.**  He referenced a couple of times.

8  **Q.**  Following the defendant's issuance of these threats via

9  text message on August 25, 2019, did the victim file a

10  restraining order against the defendant?

11  **A.**  Yes, he did.

12  **Q.**  Why?

13  **A.**  He said he felt endangered and, as a result, sought to

14  ensure his safety.  This was before he knew that the FBI was

15  investigating the matter.

16  **Q.**  Let's switch topics.  Are you aware of any previous

17  incident in which the defendant was involved in a domestic

18  dispute with his father?

19  **A.**  Yes.

20  **Q.**  When is that?

21  **A.**  It was in 2015.

22  **Q.**  And what were the circumstances?

23  **A.**  This happened in Pittsburgh, Pennsylvania.  We learned of

24  this -- as we did database checks, there was an incident report

25  that was filed by a police department in Pittsburgh for an

*Testimony of Andrew Mercurio*

1    incident involving Mr. Larkin.

2         Upon obtaining the police report, we learned that

3    following a domestic dispute between the defendant and his

4    father, the defendant took the family vehicle and exited the

5    residence at a high rate of speed.  He ended up hitting a

6    vehicle in the nearby neighborhood before driving to a bridge

7    in Pittsburgh and jumping off the bridge.  Law enforcement

8    subsequently had to retrieve Mr. Larkin from the river, and

9    that was the -- the incident that came to our attention.

10   **Q.**    Did the father seek to press charges at that time?

11   **A.**    No.

12   **Q.**    And what did he say to the police about his son?

13   **A.**    He expressed in summary that his son needed to get some

14   help and -- and alluded to the fact that his son was suffering

15   from some mental disorders and needed to be institutionalized.

16   **Q.**    The defendant was arrested -- let's switch topics again.

17   The defendant was arrested here last Friday and brought to

18   court.

19   **A.**    Yes.

20   **Q.**    Before -- so immediately before his arrest on Friday,

21   where was he?

22   **A.**    He was at the Stewart-Marchman facility.  It's a medical

23   facility here in Daytona Beach.

24   **Q.**    Why was he there?

25   **A.**    He was there pursuant to a Baker Act that was filed the

*Testimony of Andrew Mercurio*

1    previous week.

2    **Q.**    Why was he Baker Acted?

3    **A.**    So when law enforcement attempted to locate Mr. Larkin,

4    they encountered someone that was relatively combative and

5    expressed suicidal ideations.  In summary, he expressed desire

6    for law enforcement to shoot him and kill him.  It was at that

7    time that law enforcement made the decision to Baker Act

8    Mr. Larkin for medical assessment to ensure mental stability.

9         The FBI subsequently arrested Mr. Larkin at the time that

10   he was released from the medical facility when he received

11   clearance from a medical doctor.

12   **Q.**    When federal agents arrested him here last Friday, did --

13   were you there?

14   **A.**    I was.

15   **Q.**    Did you identify yourself as an FBI agent to the

16   defendant?

17   **A.**    Yes.

18   **Q.**    How did he respond?

19   **A.**    He -- he was surprised, and Mr. Larkin said, in summary,

20   "Wow.  The FBI came to see me.  I'm not your ordinary domestic

21   terrorist."

22   **Q.**    Was he read his *Miranda* rights?

23   **A.**    He was.

24   **Q.**    Did he invoke his right to an attorney?

25   **A.**    He did.

*Testimony of Andrew Mercurio*

1   Q.      Did agents ask any questions of the defendant after he

2   invoked his right to an attorney?

3   A.      No.  Other than questions that were standard for booking

4   him in and -- and transferring him to the custody of the

5   marshals, no questions in substance related to this incident.

6   Q.      Did the defendant, nevertheless, make some spontaneous

7   statements?

8   A.      Yes.

9   Q.      Did you hear them?

10  A.      Yes.

11  Q.      What did he say that you think that the Court should hear?

12  A.      While we were waiting to transfer custody to the marshals,

13  we were standing in silence, and Mr. Larkin said several --

14  made several excited utterances in our presence.  It was myself

15  and another FBI agent and a task force officer for the FBI.

16          In one instance he said, "All of this for a text."

17          He went on to talk about how he took a train to Miami, how

18  you could sit in better seats on the train without any

19  repercussions even if you didn't have a ticket for it.  He

20  talked about that's how he got down there.

21          He asked me, "If I can get in this much trouble for

22  sending a text, how much trouble could I get in for threatening

23  the President of the United States?"  He asked me if we

24  actually charge those individuals or if there were too many

25  instances of that.  I advised him that we take all threats

*Testimony of Andrew Mercurio*

18

1    seriously.

2          He also expressed to us that those people didn't have --

3    and he described the victim in this case working against him.

4          Those were some of the excited utterances that Mr. Larkin

5    made as we were waiting to transfer him to the marshals.

6    **Q.**    Now, the defendant -- let's switch topics one last time.

7    So the defendant lives in DeLand; correct?

8    **A.**    Yes.

9    **Q.**    All right.  Are you aware of whether there are any Jewish

10   temples or synagogues near where the defendant lives?

11   **A.**    Yes.  There's one within very close proximity to his

12   residence.

13   **Q.**    Have you spoken to anyone from that temple about how

14   this -- how the defendant's actions in this case have affected

15   the members of the temple?

16   **A.**    Yes.

17   **Q.**    And what have you learned that you think would be helpful

18   for the Court to know?

19   **A.**    The individual that I spoke to from that temple expressed

20   that the community at large was in -- you know, had concerns,

21   and the reason that those concerns existed was following the

22   shooting that happened in Pittsburgh.  The entire community has

23   taken the stance of "Never again" and, as such, is concerned

24   for the safety and well-being of those members of the

25   community.

*Testimony of Andrew Mercurio*

1       Several members do carry concealed.  They're authorized to

2   do so, and the community will be seeking to increase their

3   police presence given the fact that this -- these threats are

4   alarming to the community and that the defendant lives within

5   very close proximity to this particular place of worship.

6            **MS. CHANG:**    I have nothing further, Your Honor.

7            **THE COURT:**    All right, then.  Cross-examination.

8                     **CROSS-EXAMINATION**

9   **BY MR. LAMBERT:**

10  **Q.**     Agent Mercurio, you indicated that -- and I think his

11  initials are LR, the alleged victim?

12  **A.**     Yes, sir.

13  **Q.**     -- that LR had maintained a two- to three-year

14  relationship with Mr. Larkin?

15  **A.**     That's what he informed us.  Yes, sir.

16  **Q.**     So he hadn't sought to terminate it at all despite what he

17  says were the horrific things he was told?

18  **A.**     He expressed that he would mentor him and -- and talk to

19  him, as the defendant expressed some dark thoughts, but he

20  didn't terminate the relationship and seek to distance himself

21  until the most recent threats were made to him directly.

22  **Q.**     When were those threats made?

23  **A.**     August 25, 2019.

24  **Q.**     And were they all made in one day?

25  **A.**     The majority of those text messages occurred within a

*Testimony of Andrew Mercurio*

1    short window of time.  Yes, sir.

2    **Q.**    And those are the ones that are quoted in your affidavit?

3    **A.**    Yes, sir.

4    **Q.**    Now, did LR indicate that anybody else lived with him?

5    **A.**    Lived with LR?

6    **Q.**    Yes.

7    **A.**    Yes.  He lived with family.

8    **Q.**    And did the family indicate that Mr. Larkin was at the

9    residence?

10   **A.**    I don't have indication of that at this time.  We haven't

11   interviewed the family members at this time.

12   **Q.**    You weren't curious about whether or not Mr. Larkin had

13   gone to the residence?

14   **A.**    We have data that was returned from cell site data for

15   Mr. Larkin's telephone that shows him within close proximity of

16   the residence.  Based on the text messages, he talks about how

17   he was nearby, but we do not have an indication that -- that he

18   was necessarily at the home at this time.

19   **Q.**    What's close proximity to you?

20   **A.**    Close proximity to me, sir, would be, you know, within a

21   mile, within walking distance.

22   **Q.**    So a cell phone tower indicated that something bounced off

23   of it from his phone?

24   **A.**    Yes, sir.

25   **Q.**    Now, based on your training and experience, does that mean

*Testimony of Andrew Mercurio*

1    that that's where he was?

2    **A.**    It -- based on conversations with the service provider,

3    the -- yes.  Yes, it does.

4    **Q.**    And the service provider was whom?

5    **A.**    Verizon Wireless.

6    **Q.**    And you never spoke with the family to see if Mr. Larkin

7    had ever come by?

8    **A.**    Not at this time.  Not yet, sir.

9    **Q.**    Now, did LR ever indicate to you that he exchanged his

10   name with Mr. Larkin?

11   **A.**    Yes.

12   **Q.**    And where he -- not necessarily his specific address, but

13   where he lived?

14   **A.**    No.  He said he never provided his specific address or

15   where he -- he knew he lived in Miami, but not the actual

16   address.

17   **Q.**    Okay.  So Miami?

18              **THE COURT:**    Mr. Larkin, would you please be seated.

19   Thank you.

20   **BY MR. LAMBERT:**

21   **Q.**    Now, did LR indicate to you that he had a brother who

22   suffered of bipolar disorder?

23   **A.**    I don't know what the brother suffers from, sir, but I do

24   know that he's a caretaker for his brother.

25   **Q.**    And do you know that the reason for the caretaking is

*Testimony of Andrew Mercurio*

1   mental?

2   **A.**     I'm not exactly sure of the nature of the brother's

3   medical condition.  I do know that he expressed that he was a

4   caretaker.

5   **Q.**     Now, is that the only other person that lives at the

6   residence?

7   **A.**     To my knowledge, he also lives with other family members.

8   **Q.**     Would that be his parents?

9   **A.**     Yes, sir.

10   **Q.**     Now, were you present when law enforcement went to

11   Walgreens where Mr. Larkin was working?

12   **A.**     No, sir.

13   **Q.**     But you're privy to what they -- what they did and what

14   they've told you?

15   **A.**     Yes, sir.

16   **Q.**     And do you know what his -- the nature of his employment

17   there was?

18   **A.**     I -- I don't.  I know that he was working -- recently

19   employed at -- at Walgreens, but I'm not sure of the exact

20   nature of what he was doing.

21   **Q.**     Do you know how he got the job?  Through what agency?

22   **A.**     No, sir.

23   **Q.**     Do you know if he is disabled?

24   **A.**     I don't know anything other than what was obtained via my

25   observations of him, and I don't know more than what we learned

*Testimony of Andrew Mercurio*

23

1    from the medical facility where he was treated, which was that

2    he was being medicated for certain medical disorders, but I

3    don't know the nature of what those are.

4    **Q.**    Okay.  And when you say "the medical facility where he's

5    being treated," you mean the mental health facility?

6    **A.**    Yes, sir.

7    **Q.**    And that's Stewart-Marchman?

8    **A.**    Yes, sir.

9    **Q.**    And he was Baker Acted there?

10   **A.**    Yes.

11   **Q.**    And do you know what the Baker Act is?

12   **A.**    Yes.

13   **Q.**    What is it?

14   **A.**    The Baker Act is a mechanism by which law enforcement can

15   involuntarily commit someone for mental treatment -- or a

16   mental assessment, rather, where they can be held and evaluated

17   for mental disorders.

18   **Q.**    Because law enforcement -- it believes that the individual

19   is unstable (indiscernible)?

20   **A.**    Yes.  They're either a danger to themselves or a danger to

21   the community.

22   **Q.**    And how long was Mr. Larkin at that facility?

23   **A.**    He was there, I think, almost a week.  The impact of the

24   pending hurricane caused the facility to lock down over the

25   weekend.

*Testimony of Andrew Mercurio*

1    **Q.**    Which weekend?

2    **A.**    It was -- so I believe he was approached on the 27th and

3    Baker Acted.

4    **Q.**    Right.

5    **A.**    And we did not retrieve him until the following week, the

6    following Friday, so it would have been the weekend that the

7    hurricane was -- was pending after the 27th.

8    **Q.**    The weekend before you went?

9    **A.**    Yes, sir.

10   **Q.**    So he was there an extra week, Monday through Friday?

11   **A.**    Yes, sir.

12   **Q.**    And would -- did they say that was because of the

13   hurricane that he was there?

14   **A.**    They talked about the fact that the facility had been

15   locked down.  That was relayed to our counterparts -- FBI

16   counterparts here in the Jacksonville area, that -- that the

17   pending storm meant that the facility would need to lock itself

18   down and that individuals not be discharged until the facility

19   was open for that -- that option.

20   **Q.**    And it was reopened on the following Monday?

21   **A.**    I'm not sure exactly when the facility was reopened, sir.

22   I do know that the FBI office was closed on the Thursday, and

23   the first available day that the doctor advised he would be

24   able to release Mr. Larkin was the day that we retrieved him

25   from that facility.

*Testimony of Andrew Mercurio*

1   **Q.**     Now, did you check to see whether or not Mr. Larkin had

2   ever purchased a firearm?

3   **A.**     I believe law enforcement database checks came back

4   negative.  They were run by an agent in the Jacksonville area.

5   **Q.**     And do you know if anybody went by his residence to search

6   it to see if there was a firearm?

7   **A.**     A search was not conducted; however, a walk-through was

8   conducted of the residence by the agents at the time of the

9   Baker Act.  The father granted access to the residence.  They

10   observed what appeared to be a BB gun.  It resembled a real

11   firearm, and they were informed that Mr. Larkin used it to

12   shoot birds or squirrels, I believe.

13   **Q.**     So the answer is that they looked around the house and

14   there was no firearm?

15   **A.**     They did a walk-through, sir, which is different than a

16   search warrant.  They obviously can only look for things in

17   plain view, but a search was not conducted of the residence,

18   no.

19   **Q.**     (Indiscernible) take a look (indiscernible) if they were

20   granted permission, and you said they were granted permission.

21   **A.**     They were granted permission to conduct a walk-through.  I

22   wasn't present for that, so I can't speak on the specifics of

23   what those permissions were; however, I do know a thorough

24   search of the residence was not conducted.

25   **Q.**     And has a warrant ever been sought?

*Testimony of Andrew Mercurio*

1    **A.**    For the residence?  No, sir.

2    **Q.**    And do you know what Florida's red flag law is?

3    **A.**    No, sir.

4    **Q.**    And Mr. Larkin has been living at that residence for how

5    long?

6    **A.**    I believe two years.

7    **Q.**    And how long has that synagogue been there?

8    **A.**    I'm not sure, sir.

9    **Q.**    And were the members of the synagogue aware of

10   Mr. Larkin's text messages to LR, or were you the one that

11   conveyed that to them?

12   **A.**    I learned from them that they had read about what had

13   happened via the Internet.  They'd heard that Mr. Larkin had

14   been arrested, and they'd read and reviewed the complaint when

15   it was released.  They actually informed me.  I had not reached

16   out to them previously, no.

17   **Q.**    And the complaint was done on the 6th of September?

18   **A.**    The complaint is dated, if I can refer to it, on

19   August 28th.

20   **Q.**    When was it put on the Internet?

21   **A.**    I -- I know that a press release was released yesterday by

22   our office.  I believe that, at the time of the initial

23   appearance, the -- the complaint is unsealed, as it's written

24   in here.

25   **Q.**    Which was last Friday?

*Testimony of Andrew Mercurio*

1    **A.**    Yes, sir.

2    **Q.**    Which was the 6th?

3    **A.**    Yes, sir.

4    **Q.**    And you talked to them when?

5    **A.**    I spoke to members of the community this morning.

6    **Q.**    And how far away is that synagogue?

7    **A.**    I believe it's two and a half or three miles from

8    Mr. Larkin's residence.

9    **Q.**    And do you know if Mr. Larkin has a driver's license?

10   **A.**    I know that he has a driver's license.  Yes.

11   **Q.**    Are you sure about that?

12   **A.**    Based on law enforcement database checks, it identified

13   Mr. Larkin as having a driver's license.

14   **Q.**    Do you know whether or not he has a valid passport?

15   **A.**    I do not believe he has a valid passport.

16   **Q.**    Is that also based upon law enforcement telling you?

17   **A.**    No.  That came from -- I believe pretrial services did a

18   report.

19   **Q.**    Now, the spontaneous statements that you say that

20   Mr. Larkin made in your presence -- were they recorded?

21   **A.**    No.

22   **Q.**    Do you ever -- do you have the capacity to record things?

23   I know law enforcement officers have Axon recording devices

24   that they wear daily.

25   **A.**    So local law enforcement has policies that regulate what

1    it is that they can and cannot do to include recording.  The

2    FBI does not have a policy that expressly requires recording

3    other than custodial interviews.

4          When we conducted a custodial interview of Mr. Larkin

5    before he invoked his right, that was recorded, and we've

6    maintained a copy of that.

7          A body recorder, audio recorder was operated by an FBI

8    agent from the Jacksonville Division during transport; however,

9    when we arrived at the sally port here at the courthouse, those

10    materials were secured in the vehicle as we transferred him

11    inside.  It was during that time that he made those statements,

12    but they were not recorded, nor are they required to be

13    recorded per policy.

14    **Q.**    Did you ever speak with Mr. Larkin's father?

15    **A.**    I did not, no.

16    **Q.**    Have you spoken with any family member of his?

17    **A.**    I have not, no.  Other agents have.

18    **Q.**    Now, Mr. Larkin's question was about other people

19    threatening the President; is that correct?  Just --

20    **A.**    In summary, yes.  He said, "If I can get in this much

21    trouble for a text, how much trouble can you get in for

22    threatening the President of the United States?"

23    **Q.**    That was a question?

24    **A.**    Yes.

25    **Q.**    He didn't threaten the President of the United States?

*Testimony of Andrew Mercurio*

29

1    **A.**    No.

2    **Q.**    And do you know any of the medications that Mr. Larkin is

3    on?

4    **A.**    I don't recall.  I did bring them to the marshals, but I

5    don't know them offhand, sir.

6    **Q.**    And you can confirm that he has no prior criminal history?

7    **A.**    Based on our record checks, that is correct.

8    **Q.**    And he is 25 years of age?

9    **A.**    Yes, sir.

10                **MR. LAMBERT:**    Thank you.  (Indiscernible.)

11                **THE COURT:**    All right.  Ms. Chang, any redirect?

12                **MS. CHANG:**    No, Your Honor.

13                **THE COURT:**    Thank you.  You're excused.

14                Additional witnesses for the Government?

15                **MS. CHANG:**    No additional witnesses, Your Honor.

16                **THE COURT:**    Okay.

17                **MS. CHANG:**    We'll just be proffering the contents of

18    the pretrial services report, which is already before the

19    Court.

20                **THE COURT:**    Okay.  All right.  Mr. Lambert, do you

21    intend to call any witnesses?

22                **MR. LAMBERT:**    Judge, I was going to call his twin

23    sister.

24                **THE COURT:**    Okay.

25                **MR. LAMBERT:**    (Indiscernible.)

*Testimony of Martha Larkin*

1      **THE COURT:**   I'm sorry.  Could you repeat the name.

2      **MR. LAMBERT:**   It's Martha Larkin.

3      **THE COURT:**   All right.  Ma'am, if you'll come forward

4   to the witness stand on your right.  Please remain standing to

5   be sworn.

6      **THE COURTROOM DEPUTY:**   Please raise your right hand.

7                      **MARTHA LARKIN**

8   was called as a witness on behalf of Defendant and, having been

9   duly sworn, testified as follows:

10     **THE WITNESS:**   (Indiscernible.)

11     **THE COURTROOM DEPUTY:**   Please be seated

12  (indiscernible).

13     **THE WITNESS:**   My name is Martha Larkin.  That's

14  M-a-r-t-h-a L-a-r-k-i-n.

15     **MR. LAMBERT:**   May it please the Court and counsel.

16     **THE COURT:**   Please.

17                   **DIRECT EXAMINATION**

18  **BY MR. LAMBERT:**

19  **Q.**     Martha, how old are you?

20  **A.**     I am also 25.  My brother and I are twins.  He's a minute

21  older.

22  **Q.**     And did you grow up together?

23  **A.**     Yes.

24  **Q.**     When was the last time that the two of you lived together?

25  **A.**     I moved out of my house at 18 to attend college.  That is

*Testimony of Martha Larkin*

31

1    the last time I've consistently lived with my brother for more

2    than two or three months at a time.

3    **Q.**     And where were you living at that time when you moved out?

4    **A.**     I attended Penn State University, where I received my BFA

5    in creative writing and my BA in English with honors.

6    **Q.**     And was Hanson living in the Pennsylvania area?

7    **A.**     Yes.  He lived with my parents, who had residency in

8    Pittsburgh, Pennsylvania.

9    **Q.**     And your parents -- are they both still alive?

10   **A.**     Yes.

11   **Q.**     And your dad is here today in the courtroom?

12   **A.**     Yes, he is.

13   **Q.**     And how old is your dad?

14   **A.**     My dad is 72.

15   **Q.**     And how old is your mom?

16   **A.**     My mom is 57.

17   **Q.**     And where does your mom --

18   **A.**     Excuse me.  She's actually 62.  I apparently don't know my

19   mother's birthday.  I'm not the best daughter in that respect.

20   **Q.**     That's quite all right.  She'd be thankful that you said

21   57.

22          Where does she currently live?

23   **A.**     My mother currently lives in Pittsburgh, Pennsylvania,

24   where she still continues to work at the University of

25   Penn State.

*Testimony of Martha Larkin*

1    Q.      And is she -- do you know whether or not she's coming down

2    here?

3    A.      Yes.  We have discussed she has flight arrangements to

4    arrive here Thursday morning.

5    Q.      And when you say "here," you're talking about --

6    A.      I mean the local area.  She'll be flying into Daytona and

7    staying with my father.

8    Q.      And do you have other relatives that live in the Volusia

9    County area?

10   A.      Yes.  My dad has two sisters, my aunts, who live in the

11   local area.  My aunt Kim lives in the Port Orange area.  My

12   aunt Melga lives in Ormond Beach.  They are both local.  My

13   cousin, who is also an adult -- her name is Kellie -- she lives

14   in the Daytona area with our other cousins as well.

15   Q.      And are -- are -- is it -- is it a close family unit?

16   A.      We are sort of close.  They're in constant contact.  I

17   mean, we live a little bit further away and people have jobs

18   and lives and, you know, sometimes time slips away, but if my

19   dad called them and said that he needed them there, they would

20   be there.

21   Q.      Are those relatives aware of this situation?

22   A.      Yes, they are.

23   Q.      And have they pledged their support?

24   A.      Yes, they have.

25   Q.      And has your mom indicated how long she's going to stay

*Testimony of Martha Larkin*

33

1    here?

2    **A.**    She is planning to stay here at least through the first

3    week of October, if not longer if necessary.

4    **Q.**    And will you be returning to -- I don't even think I asked

5    you where you are now.

6    **A.**    I'm currently at the University of Illinois.  I received

7    my master's in English this spring.  I'm continuing on for PhD

8    coursework.  I also work at the university as an instructor.

9    **Q.**    And will you be returning there?

10    **A.**    Yes.  I have to return for work.  It's the second week of

11    classes, and my students are e-mailing me.

12    **Q.**    Now, do you know whether or not your brother receives

13    social security disability?

14    **A.**    Yes, he does.

15    **Q.**    And do you know what for?

16    **A.**    He receives it because he has mental health issues,

17    particularly autism spectrum disorder and bipolar II.

18    **Q.**    And throughout his childhood, has he suffered those

19    maladies?

20    **A.**    Yes.  I would say, starting around the age of 7, he has

21    been experiencing intense mental health issues, and we have

22    dealt with them throughout our entire lives.

23    **Q.**    When you say "we," you mean you, your mom, your dad?

24    **A.**    Yes, our family unit.  Correct.

25    **Q.**    And has Hanson ever been employed?

*Testimony of Martha Larkin*

34

1    **A.**    Not consistently.  He struggles very much with order, and

2    he is functionally unable to take care of himself.

3    **Q.**    Now, the job at Walgreens -- do you know how that came

4    about?

5    **A.**    Yes.  He works with a vocational specialist through the

6    State of Florida who helps people with mental illnesses receive

7    employment and have assistance to do so.  So he works with a

8    job coach who goes to the job with him, explains the social

9    behavior, how you're supposed to do the job, and corrects him

10    if he's doing it inappropriately.

11    **Q.**    And that -- that employment was at Walgreens?

12    **A.**    Correct.

13    **Q.**    And he was a stacker there?

14    **A.**    Yes.

15    **Q.**    A shelf stacker but (indiscernible) --

16    **A.**    He's very good at putting things in order despite the

17    state of his life.  Yes.

18    **Q.**    With regard to school, do you know how far he went?

19    **A.**    My brother graduated with a high school degree.  He took

20    some college classes, but he never completed.  To be frank, he

21    had a very difficult time completing his high school diploma

22    despite his education or his ability to learn.  He is very

23    intelligent, but he had to take extra time to complete his high

24    school degree due to his mental health issues.

25    **Q.**    Do you know whether or not he has a driver's license or

*Testimony of Martha Larkin*

35

1    has ever had a driver's license?

2    **A.**     No, he does not have a driver's license.  He does not have

3    a learner's permit.  I do have a driver's license that is

4    valid.  We have tried to give him a lesson or two.  He has no

5    aptitude for it whatsoever, and due to his mental health

6    issues, quite frankly, we have tried to prevent him from

7    seeking any sort of ability to have means to leave.

8    **Q.**     Does he have, though, a valid Florida identification card?

9    **A.**     Yes, he does have a Florida state identification.  Due to

10   his mental health issues, we try to make sure that he is

11   properly ID'd at all times in case situations with the police

12   do arise.

13   **Q.**     Do you know whether or not he has a passport and, if so,

14   whether or not it's valid?

15   **A.**     Yes.  So he does have a passport card, which allows him

16   entry into Canada and Mexico.  We received those in high school

17   because we went to -- a trip to Mexico.  But since they were

18   issued at the same time -- my passport card expires in

19   November 2019.  His does as well.  I have also brought that to

20   court to surrender.

21   **Q.**     Okay.  And you gave it to me?

22   **A.**     Yes.

23   **Q.**     Do you know what medications your brother is on?

24   **A.**     My brother has been on many different medications

25   throughout his lifetime, but I do have a current list that is

*Testimony of Martha Larkin*

1    made available to me through Stewart-Marchman.  I will read

2    those to you off this list right now.  Okay?

3    **Q.**    Sure.

4    **A.**    So give me one second to organize my thoughts and papers.

5    Currently, he is listed as taking Lexapro, Geodon, lithium,

6    Haldol, which is H-a-l-d-o-l, and Ativan.

7    **Q.**    And those are what was prescribed to him at the mental

8    health facility that he just left?

9    **A.**    Correct.

10    **Q.**    And that mental health facility is someone that's -- or is

11    an agency that's been monitoring him for the two years that

12    he's been here?

13    **A.**    Correct.  He does have social services here.  He sees a

14    therapist, and he also has a case manager who works with he and

15    my dad to help with his mental health issues.

16    **Q.**    And did the same type of protocol exist up in Pittsburgh?

17    **A.**    Yes.  Absolutely.

18    **Q.**    And with regard to his medications, do you know whether or

19    not they are pills or tablets or whether or not they're

20    injections?

21    **A.**    He has most often take- -- he has not taken any

22    injections.  They have all been pill form.

23    **Q.**    Now, does he own any real estate?

24    **A.**    No.  He lives with my parents.  He does not own anything

25    with his name on it.

*Testimony of Martha Larkin*                                                    37

1    **Q.**    And the -- the place where your dad lives in DeLand -- is

2    that a single-family dwelling?

3    **A.**    Yes, it is.

4    **Q.**    And is that owned by your father?

5    **A.**    That is owned by my father and my mother, yes.

6    **Q.**    And do you know whether or not your brother has a bank

7    account?

8    **A.**    He does have a bank account of which he has access to, but

9    we have brought that card and that information for the Court to

10   have access to.

11   **Q.**    Were you able to determine, if you had the opportunity,

12   how much money was in it?

13   **A.**    I have not, but, to be quite frank, it's not like he makes

14   a lot of money through his occupation- -- his occupational

15   therapy job.  I would not say that he had more than $500 at

16   there at any given time if I had to make an educated guess.

17   **Q.**    And is it just your father and your brother that lived at

18   the --

19   **A.**    Currently, yes, that is the case.  Due to my brother's

20   mental health issues, he and my mother have a contentious

21   relationship.  With his bipolar disorder, he has some psychosis

22   that has led him to believe that my mother is abusive towards

23   him.  All documentations of that are not reality.  My father

24   and I can also attest to that, that he has sometimes psychotic

25   thoughts that are not founded in reality.

*Testimony of Martha Larkin*

1  **Q.**   Physically, how is your brother?

2  **A.**   He struggles greatly with personal care due to his mental

3  health.  We do our best to help him with that, but he does have

4  some hygiene issues.

5  **Q.**   And does he stay at home?

6  **A.**   Yes.  He spends 98 percent of his time in my parents'

7  house.

8  **Q.**   Now, do you know whether or not your brother has ever had

9  a pilot's license? a boat captain's license?

10  **A.**   Sir, he can't even ride a bicycle, let alone drive a boat,

11  a car, or a plane.

12  **Q.**   And does your father have a vehicle?

13  **A.**   Yes, my dad does have a vehicle.

14      **MR. LAMBERT:**   I don't have anything further.

15      **THE WITNESS:**   Thank you.

16      **THE COURT:**   All right.  Ms. Chang, cross.

17              **CROSS-EXAMINATION**

18  **BY MS. CHANG:**

19  **Q.**   Good morning, Ms. Larkin.

20  **A.**   Good morning.

21  **Q.**   Are you aware of your brother ever having thoughts of

22  harming himself?

23  **A.**   Yes.

24  **Q.**   And when did that start, approximately?

25  **A.**   His first suicide attempt was approximately age nine.

*Testimony of Martha Larkin*

1   **Q.**    Has he had any other suicide attempts since then?

2   **A.**    Multiple.  In my lifetime, he's had at least five major

3   episodes.

4   **Q.**    And what were the means by which he attempted to commit

5   suicide?  And I apologize.  I know this is --

6   **A.**    That's fine.

7   **Q.**    -- really awful, you know.

8   **A.**    So three of those incidents were medication based.  Two of

9   them were Tylenol overdoses.  One was an overdose on

10  prescription medication that he found in a cupboard.  One was

11  an attempt to self-harm via cutting, and then one was a very

12  bad incident in which the FBI officer has described in which he

13  jumped off a 13- -- a 3,000-foot bridge.

14  **Q.**    As in the bridge was 3,000-feet long?

15  **A.**    Tall.

16  **Q.**    Oh.

17  **A.**    It is a very high bridge.  He is the only person to have

18  jumped off of it and survive in the last 20 years.

19  **Q.**    Okay.  Are you aware of other times in which he has been

20  institutionalized?

21  **A.**    Countless.

22  **Q.**    When you say "countless," I mean, do you really mean

23  countless?

24  **A.**    I mean, he has been institutionalized in my lifetime at

25  least 15 times if not more.

*Testimony of Martha Larkin*

1    **Q.**    All right.  You've mentioned near the end of your direct

2    testimony that he obviously could not pilot a plane or drive a

3    boat because he can't even drive a car.  So you're not aware

4    that he has a valid driver's license at this time?

5    **A.**    Ma'am, to my knowledge, it is not a driver's license; it

6    is a state ID.  He would have had to take my father's vehicle

7    to take that exam.  He does not have access to any other

8    vehicles, and my dad did not take him to a driver's test, and

9    you cannot take your driver's test if you drive yourself there;

10    correct?

11    **Q.**    So you're not a valid -- you're not aware that he had a

12    driver's license issued to him on June 12th of 2018?

13    **A.**    Not that I was aware of.  I am very sure that is a state

14    ID card.

15    **Q.**    And with respect to the time when your brother jumped off

16    the bridge, was that in 2015?

17    **A.**    To my knowledge, it is.

18    **Q.**    And how did he get to the bridge?

19    **A.**    He did drive the vehicle.  The damage that was referenced

20    is the fact that he cannot drive and thus struggled to arrive

21    there.

22    **Q.**    But he did drive the car to the bridge; correct?

23    **A.**    Technically, yes.

24    **Q.**    As in he got behind the wheel, turned on the car, and

25    drove to the bridge, Ms. Larkin?

*Testimony of Martha Larkin*                                    41

1    **A.**    Unfortunately, yes.

2              **MS. CHANG:**   I have nothing further.

3              **THE COURT:**   Anything in redirect, Mr. Lambert?

4              **MR. LAMBERT:**   Very brief, Judge.

5                         **REDIRECT EXAMINATION**

6    **BY MR. LAMBERT:**

7    **Q.**    Ms. Larkin, do you have his wallet?  Did you bring that

8    today?

9    **A.**    I do have his wallet.  It is not on my person.  It is

10   located in my vehicle, but I would be willing to go to our

11   vehicle to get that and show the documentation.

12   **Q.**    And the documentation that you've -- that you have looked

13   at in there is a Florida identification card as opposed to a

14   driver's license?

15   **A.**    Yes.

16             **MR. LAMBERT:**   Nothing further, Judge.

17             **THE COURT:**   All right.  Ma'am, you're excused.  Thank

18   you for coming here today.

19             **THE WITNESS:**   Thank you, Your Honor.

20             **THE COURT:**   Mr. Lambert, any additional witnesses?

21             If you need a moment, we'll take a recess.  Do you

22   need a moment?

23             **MR. LAMBERT:**   (Indiscernible.)

24             **THE COURT:**   All right.  I'll give you a recess.

25   Also, I just want to tell you I'm going to ask you whether you

*Testimony of Harry R. Larkin*

1    perceive there to be any current competency issues that need to

2    be evaluated, and I'm going to address that with you and

3    opposing counsel at the -- at the end of this hearing.  Okay?

4              **MR. LAMBERT:**    Yes, sir.

5              **THE COURT:**    All right.  Thank you.  We'll take a

6    brief recess.

7              (Recess at 11:05 A.M until 11:14 A.M.)

8              **THE COURT:**    All right.  Mr. Lambert, I can see you've

9    decided to call Mr. Larkin, so we'll go ahead and swear him in.

10                            **HARRY R. LARKIN**

11   was called as a witness on behalf of Defendant and, having been

12   duly sworn, testified as follows:

13             **THE WITNESS:**    Amen.  Yes, ma'am.

14             **THE COURTROOM DEPUTY:**    Please be seated and state

15   your name for the record.

16             **THE WITNESS:**    My name is Harry Richard Larkin.

17   H-a-r-r-y.  Larkin, L-a-r-k-i-n.

18             **THE COURTROOM DEPUTY:**    Thank you.

19             **MR. LAMBERT:**    May it please the Court, counsel.

20             **THE COURT:**    Please.

21                         **DIRECT EXAMINATION**

22   BY MR. LAMBERT:

23   **Q.**    Mr. Larkin, what it is your relationship to Hanson Larkin?

24   **A.**    I'm his father.

25   **Q.**    And besides Martha, who we've met, are there any other

1    children?

2    **A.**      No, sir.  Oh, I'm sorry.  I didn't -- I did not realize

3    it's your business part of it.  Okay.  No, there were no other

4    children.

5    **Q.**      And are you employed?

6    **A.**      Not currently.

7    **Q.**      Okay.  Are you retired?

8    **A.**      Yes, I'm retired.

9    **Q.**      And from what?

10   **A.**      Actually, two -- two jobs.  For the last 15 years of my

11   life, I worked seven days a week.  I worked for the Pittsburgh

12   Parking Authority as a garage manager, and I had a part-time

13   job in a condominium in Pittsburgh, park and course for

14   residents.

15   **Q.**      And when was it that you moved here to Volusia County,

16   Florida?

17   **A.**      About two or three years ago.

18   **Q.**      And when you moved here, did you purchase a place to live?

19   **A.**      Yes, sir.  We had to look for a place.  We -- because of

20   the family situation, we had to find -- I never in my life

21   calculated having two residences.  You know, this is not a

22   summer home.  So we find it a very nice place.  A little bit

23   further away from my family than I wanted, but that's, you

24   know --

25   **Q.**      And when you say, "We did that," you're talking about you

*Testimony of Harry R. Larkin*

44

1    and your wife decided --

2    **A.**     Yes.

3    **Q.**     -- to get a place here?

4    **A.**     It was a family effort.

5    **Q.**     And then, when you moved here, did you move here with

6    Hanson?

7    **A.**     Yes.

8    **Q.**     And was it just the two of you?

9    **A.**     Yes.  His mother came down with us, but she went back to

10   Pittsburgh.  She's still employed.

11   **Q.**     And she is younger?

12   **A.**     Yes, sir.

13   **Q.**     In the entire time that you've lived here, has Hanson

14   lived with you?

15   **A.**     Yes, sir.

16   **Q.**     And during that period of time, has he been employed other

17   than this Walgreens?

18   **A.**     No, sir.  No, sir.  He -- well, actually, technically, he

19   had a job for about one day at McDonald's, but that -- that

20   was -- we went to the -- it's the Florida Department of

21   Education, Department of Vocational Rehabilitation, you know,

22   and we went there, talked to the -- took the various test

23   assessments, and then we -- he got a job coach.  He chose a --

24   there were a couple of options for him to choose, but -- and

25   that's how he got this job at Walgreens is a job coach found it

*Testimony of Harry R. Larkin*

1     for him.

2     **Q.**     And does he get social security disability?

3     **A.**     Yes, sir.

4     **Q.**     And do you know approximately how much he gets a month?

5     **A.**     It's around 700- (indiscernible), in that range.  690,

6     maybe 710.  I can't -- I -- his mother is his representative

7     payee.

8     **Q.**     Okay.

9     **A.**     So I don't really look at that.

10     **Q.**     And because of that, does the check go up to her, or does

11     it come to an account here, or do you know?

12     **A.**     Well, in order to get that, she had to set up a

13     representative payee account --

14     **Q.**     Right.

15     **A.**     -- and that's based in a bank based in Pittsburgh, which

16     is also -- has branches down here, Pittsburgh National Bank.

17     **Q.**     And on a daily basis, if he's not working at Walgreens,

18     what -- what does Hanson do?

19     **A.**     Hanson likes butterflies.  Hanson likes a lot of things.

20     Hanson reads sometimes.  Hanson is a very serious person

21     sometimes, and he plays games.

22     **Q.**     And when you say "plays games," you mean, like,

23     PlayStation --

24     **A.**     Yeah.

25     **Q.**     -- and that kind of stuff?

*Testimony of Harry R. Larkin*

1    **A.**    That kind of thing.  Yes, sir.

2    **Q.**    Does he have a cell phone?

3    **A.**    Yes, sir.

4    **Q.**    And was that on a plan with you or you and your wife?

5    **A.**    Yeah, my wife.  My wife's plan.  I'm on her plan too.  And

6    that's out of -- actually, I guess it's out of Pittsburgh, but

7    Lord knows where.

8    **Q.**    Is there a home computer?

9    **A.**    Yes, sir.

10    **Q.**    And does Hanson have access to that?

11    **A.**    Yes, sir.

12    **Q.**    Do you know if you and he share a password, or do you have

13    different ones?

14    **A.**    No.  We share a password.

15    **Q.**    Now, do you know whether or not Hanson has ever had a

16    firearm?

17    **A.**    I know that he has not had a firearm.  Yes.  Putting it

18    like that, I know that he has never had a firearm.  I

19    personally have never had a firearm.  As I told you, I'm a

20    member of the (indiscernible) Beach Church, and in 72 years

21    I've never had a need to have a gun.

22    **Q.**    And did a law enforcement agency come by your house and

23    ask to go through it or search it to look through it?

24    **A.**    Not technically.  You know, I mean, I realized when I let

25    them in the house what the legal consequences were.  I have

*Testimony of Harry R. Larkin*

1    nothing to hide.

2    **Q.**    Right.

3    **A.**    You know?  I mean, you know, and the house was very messy.

4    It's been a very difficult time lately.  That's it.

5    **Q.**    And was that when Hanson was hospitalized?

6    **A.**    At that point, no.  And Hanson, I don't believe, was

7    hospitalized at that point.  I'm not sure because it sort of

8    runs through that in my mind how that happened.  All I know is

9    at one point, you know, there's two off- -- federal -- there

10   were federal officers, I suppose.  And they came in.  They said

11   bop, bop, bop.  And they'd indicated no -- what he had done, I

12   didn't know.  I know he went to Miami, and other than that, I

13   had no idea what had happened.

14   **Q.**    Had they mentioned anything about terroristic threats or

15   anything like that?

16   **A.**    No, sir.

17   **Q.**    Now, with regard to Hanson's medication, has he been on

18   mental health medication for a long time?

19   **A.**    Yes, sir.

20   **Q.**    And the medication that he's on -- do you supervise that?

21   **A.**    As best I can.  I mean, I -- I cannot force him to take it

22   or not take it or that.  He -- he -- that's the way it works.

23   **Q.**    Sure.  But he's an adult.

24   **A.**    He's an adult.

25   **Q.**    Right.  But you -- you can see whether or not he is taking

*Testimony of Harry R. Larkin*                                                      48

1    his medication.

2    **A.**     I will be honest with you, Mr. Lambert.  Compliancy has

3    never been a strong suit of him with medication.

4    **Q.**     Now, you -- it's apparent that you use oxygen.

5    **A.**     Yes, sir.

6    **Q.**     Physically, what -- do you have any disabilities?

7    **A.**     I -- I have congestive heart failure, not uncommon.  I

8    have COPD.  It's medium, but right now I'm very stressed, and

9    that affects my ability to breathe, and that is my physical

10   disability.  And as a result of the congestive heart failure, I

11   have edema.  You know, the list goes on.

12   **Q.**     Do you drive a vehicle?

13   **A.**     Yes, sir.

14   **Q.**     And if -- if Hanson has to go places, are you the one that

15   drives him?

16   **A.**     Yes, sir.

17   **Q.**     If the judge were to release Hanson, could you assure the

18   Court that if Hanson acted out in any fashion, that you would

19   notify the Court?

20   **A.**     Yes, sir.

21   **Q.**     Would you have any problem with doing that?

22   **A.**     No, sir.  Why would I?  I don't -- I don't want my son in

23   trouble.  I would have no problem doing that.  I was a

24   supervisor at work.  So --

25           **MR. LAMBERT:**    I don't have anything further.

*Testimony of Harry R. Larkin*                                                        49

1        **THE COURT:**    All right.  Cross-examination, then,

2    Ms. Chang.

3                        **CROSS-EXAMINATION**

4    **BY MS. CHANG:**

5    **Q.**    Good morning, Mr. Larkin.

6    **A.**    Good morning, ma'am.

7    **Q.**    Is everything -- you heard your daughter, Martha --

8    **A.**    Yes.

9    **Q.**    -- testify earlier today; correct?

10   **A.**    Yes, sir -- yes, sir.  I'm sorry.  Yes, ma'am.  Yes.

11   **Q.**    It's all right.

12            And she said a number of things about the number of

13   suicide attempts that your son has made.  Do you remember that?

14   **A.**    Yes.

15   **Q.**    Is everything that she said true?

16   **A.**    Yes, but -- but might I just tell you one thing.  When

17   you -- when you say "suicide attempts," the -- the one incident

18   with the Homestead High Level Bridge was a series.  He tried,

19   like, three or four -- multiple mechanisms in one suicide

20   attempt starting out with the Tylenol, cutting himself.

21   **Q.**    I see.

22   **A.**    Okay?  It wasn't, like, one big take the pills, you know.

23   **Q.**    But there was that sort of series of events, and then

24   there was the bridge-jumping event; is that correct, sir?

25            And I apologize for stressing you out.  I'm not trying to

1   be difficult.

2   **A.**     Well, you know what?  That was a very stressful

3   (indiscernible).  You know, it's -- the Homestead High Level

4   Bridge -- I think my daughter's sense of height was a little

5   off.  But, believe me, I -- if you have vertigo, I wouldn't

6   look over the edge of the bridge.

7   **Q.**     And do you remember what your daughter, Martha, said about

8   the number of times that your son has been institutionalized?

9   She said he had been institutionalized countless times, but

10  then she brought it to more than 15.  Is that accurate?

11  **A.**     Probably.  Like, four different mental institutions in the

12  state of Pennsylvania.

13  **Q.**     Switching topics, do you recall speaking with an FBI agent

14  at some point in the last two weeks?

15  **A.**     Yes.

16  **Q.**     And do you recall telling that agent that your son is

17  manipulative?

18  **A.**     Of course.  That's part of his mental health issues.

19  **Q.**     And so he uses his -- you told the agent he uses his

20  mental health issues to manipulate others?

21  **A.**     I don't think I put it like that.  I mean --

22  **Q.**     How would you put it?

23  **A.**     I would put it like -- I have been exposed to people with

24  mental health issues for a long time.  I worked at a hospital.

25  Part of one of the hospitals in that system was a mental health

*Testimony of Harry R. Larkin*                                              51

1    institution.  I have been around people with mental health

2    issues.  People get what they want in different ways.  That's

3    what I mean.  So in terms of manipulating, Hanson is no

4    different than anybody else, including my wife.

5            MS. CHANG:    I have nothing further, Your Honor.

6            THE COURT:    All right.  Thank you.

7            Anything in redirect?

8                    **REDIRECT EXAMINATION**

9    **BY MR. LAMBERT:**

10   **Q.**    Mr. Larkin, the -- your son's diagnosis is he suffers from

11   a bipolar disorder?

12   **A.**    He has had multiple diagnoses.  One of them is bipolar II.

13   One of them has been bipolar, you know.

14   **Q.**    Autism?

15   **A.**    Autism.  Do you want the whole, you know, diagnoses tag?

16   I can't -- I can't -- I couldn't honestly remember the amount

17   of diagnoses.  As I told you, he's in four different mental

18   institutions.

19   **Q.**    And these are facilities that doctors have put him in?

20   **A.**    Yes.  Doctors, or situations have come up in his life

21   where he needed to.

22            THE WITNESS:    Hanson, calm down, please.  It's all

23   right.  I'm -- it's all right.

24            You know, I can -- I'll name the four big ones, and

25   some of the other things he's been in are just, like,

*Testimony of Harry R. Larkin*

52

1    respiratory care and things like that, but Western Psychiatric

2    Institute and Clinic of the UPMC health system, Mercy

3    Behavioral Health, Southport hospital, and Forbes Regional of

4    the Allegheny health system.

5    **BY MR. LAMBERT:**

6    **Q.**    And the last time he was in a similar facility?

7    **A.**    That was Mercy Behavioral Health.

8    **Q.**    And when, approximately, was that?

9    **A.**    About two or three years ago.

10   **Q.**    And since he's been here in Volusia County -- and I know

11   we're -- we're in Orange County, but where you live in Volusia

12   County, has he had a mental health caregiver or a place where

13   he goes where he receives counseling --

14   **A.**    Yes, sir.  We -- it was necessary to have that.  You know,

15   I know from experience it's a complicated system.  So we -- we

16   found Stewart-Marchman, and finally that's where we ended up.

17   **Q.**    And he's been with them for a little over two years?

18   **A.**    Yes, sir.

19   **Q.**    And do you know if they take any tests of him to confirm

20   his taking of medication or his lack of taking medication?

21   **A.**    As far as I know, no.  I know his -- his counselor -- he

22   has also a psychiatric -- I don't -- I'm not sure what -- a

23   CNRA [sic].  You know, she had been prescribing medication for

24   him.  At the time, when I first got here, it was -- like, I

25   didn't know who was doing it, and we find -- but -- but her

1     name is on this list.  She talks to him.

2            We were sending him early on, on a basis of maybe once a

3     month.  Now it's been down to less than that.  So he has a --

4     his mental health counselor is that, but from what I

5     understand, they can't prescribe drugs at Stewart-Marchman,

6     which at the time I didn't know, you know.

7            **MR. LAMBERT:**    Thank you.

8            **THE COURT:**    All right.

9            **THE WITNESS:**    Okay.

10           **THE COURT:**    Thank you, sir.  You're excused.

11           **THE WITNESS:**    (Indiscernible.)

12           **MR. LAMBERT:**    Take your time.

13           **THE WITNESS:**    That's okay.  I'll get it.

14           **THE COURT:**    Take your time.

15           **THE WITNESS:**    Thank you, Judge.

16           **THE COURT:**    You're welcome.  Thank you.

17           Mr. Lambert, any additional witnesses?

18           **MR. LAMBERT:**    No, sir, I do not.

19           **THE COURT:**    All right.  Before we proceed to

20    argument, let me just ask:  You've been working with

21    Hanson Larkin here today, you've had time to speak with him,

22    and you've seen his conduct.  Are there any bases upon which

23    you think a competency evaluation should be ordered by the

24    Court?  My concern is, you know, if there's a competency issue

25    here today and given the recentness of his discharge from the

1       Baker -- from being Baker Acted -- obviously, there's a basis

2       for me to be concerned about that, and I don't want to make a

3       ruling on the issue of bond if there's an underlying competency

4       issue that should be determined first.  So given your

5       interactions with your client, what is your assessment of that?

6       And if you wouldn't mind standing over by the microphone so we

7       have a clear record of your comments.

8                    MR. LAMBERT:    Judge, I've probably seen Hanson five

9       or six times within the last week or so, each time for close to

10      an hour, sometimes more.  I've had a lot of mental health

11      cases.  The bar is very low for competency.

12                        He knows where we are.  He knows who you are, what

13      your function is.  He knows my function.  He knows the State's

14      function.  Sadly, that pretty much hits it.  You can see --

15      he's not being disrespectful by standing up.

16                    THE COURT:    I'm not perceiving it that way.

17                    MR. LAMBERT:    And, you know, just the other

18      mannerisms that he has are just consistent with the disease

19      that -- that he suffers from.  So, no, I don't think he is

20      incompetent.  I appreciate the Court's concern about that.

21                        I did provide the Government with the -- I obtained

22      yesterday all of the records from Stewart-Marchman, and I think

23      on August the 24th -- 23rd they did a psychological evaluation

24      of him, which was before he was brought back in on the

25      Baker Act on the 27th.  So I have no problem with the Court

1   going through this if it would make -- give you comfort.

2           THE COURT:   I mean, if you want to offer it, I'll --

3   I'll accept it as long as there's no objection.  On the other

4   hand, if you don't want to move it into the record, then it's

5   not there for me.

6           MR. LAMBERT:   I think it would help --

7           THE COURT:   Okay.

8           MR. LAMBERT:   -- all the way around, and it's his

9   entire history there.

10          THE COURT:   All right.  So I'm assuming you want that

11  sealed?

12          MR. LAMBERT:   Yes, sir, I do.

13          THE COURT:   All right.  Ms. Chang, any objection to

14  the Court accepting that in evidence and sealing it?

15          MS. CHANG:   No, Your Honor.

16          THE COURT:   All right.  Okay.  Thank you.

17       (Defendant's Exhibit No. 1 was admitted into evidence.)

18          THE COURT:   All right, then.  Ms. Chang.

19          MS. CHANG:   Your Honor, the United States is moving

20  for detention both because the defendant poses a danger to the

21  community and also due to risk of nonappearance, primarily

22  because of the harm he poses to himself and also because he

23  does not appear to have any problem not complying with rules.

24          So the nature and circumstances of this offense are

25  incredibly serious, which I'm sure the Court understands.  The

1   defendant threatened to commit a mass shooting at a local

2   synagogue.  That's a hate crime.  And that arose from the

3   defendant's travel to Miami to visit the victim -- or the Miami

4   area to visit the victim who had previously rebuffed his

5   advances, explicitly told the defendant not to visit, and told

6   the defendant he was not going -- they were not going to meet,

7   but the defendant came anyway, stalked the victim by going to

8   his neighborhood, sending him a text message, saying, "You live

9   here, don't you?  I want to smell your fear.  Come out so I can

10  smell your fear."  And then he threatened to shoot a bunch of

11  people out of anger that the victim wouldn't agree to meet him.

12          And so the nature and circumstances of this offense

13  weigh in favor of detention because they reflect the

14  defendant's mental instability, his willingness to go to

15  extremes when he doesn't get his way, his inability to respect

16  boundaries, and his predisposition towards violence or at least

17  making threats involving violence, and those are credible

18  threats.

19          His actions have sent a ripple of fear through the

20  local Jewish community, particularly at the local Jewish temple

21  that is just two and a half or three miles away from his home.

22          The weight of the evidence against the defendant is

23  strong, as set forth in the complaint and in today's testimony,

24  and that also weighs in favor of detention.  Not to mention, I

25  think, not only are the facts in the complaint affidavit clear

1    that this is the defendant -- this is indeed the person who

2    issued the threats, but when the FBI had come to arrest him and

3    he made these spontaneous statements, he admitted to making --

4    to sending the text message.  "All this for a text message?

5    What happens if I threaten the President?"  So he has more or

6    less admitted implicitly that he committed this offense and

7    sent these text messages.

8             The defendant's personal history and characteristics

9    further weigh in favor of detention.  As his sister said,

10   starting at age seven, he had, and I quote, "intense mental

11   health issues," and he has a history of doing crazy things,

12   like in 2015 when he jumped off the bridge and survived, and

13   that was following a dispute with his father.

14            As his sister, Martha Larkin, testified, he has

15   numerous psychotic issues.  He has psychosis, and he has

16   previously not only made threats to kill himself, as the agent

17   testified, he said he wanted the police to kill him.  So it's

18   not just about -- you know, it -- he has a lot of thoughts of

19   him dying, and whether that's provoking others to do that to

20   him or him doing it to himself, he's also -- the record's clear

21   that he has attempted to do this multiple times.

22            On top of that, this defendant harbors hatred towards

23   Jewish people and, as I said before, issued a threat to commit

24   a mass shooting targeting them.

25            He was Baker Acted as recently as last week,

1   following a threat to kill himself.  He has been hospitalized

2   upwards of 15 times.  He's only 25 years old, but he's been

3   hospitalized more than 15 times, and he's extremely unstable.

4   And that combined with the evidence of what he says he's

5   willing to do makes him extremely dangerous.

6            It's not that hard to get a gun.  It does not matter

7   that Florida may have a red flag law.  It does not matter that

8   he does not have a driver's license.

9            I'm sorry, Your Honor.  On that point, the agent

10  testified that he had a driver's license based on his review of

11  law enforcement records.  He has since re-reviewed the records

12  and realized that even though it says "driver's license status

13  valid," that it's an ID card.  So I just wanted to clarify for

14  the record the defendant has an ID card.  As his sister said,

15  as his father said, it's not a driver's license.

16           **THE COURT:**   Right.

17           **MS. CHANG:**    I wanted to clarify that, Your Honor,

18  because we just came across that in the recess.

19           But going back, it doesn't matter that he doesn't

20  have a driver's license.  He has driven a car.  He has driven a

21  car to the bridge, where he jumped from the bridge.  So this

22  defendant -- it doesn't matter if you impose rules on him, if

23  you impose an ankle monitor or home confinement or you have to

24  stay medicated.

25           His father, who has been -- who has essentially been

1    his caretaker, says, "Well, I can't really make him comply with

2    taking medicine.  You know, I can't really make him do that."

3    So --

4              **THE COURT:**    All of that concerns me greatly, so I've

5    heard what you said, but is there a residential option for him

6    to be confined to a facility?  Not to a family member's house,

7    but to a facility so that he can be -- I mean, the record shows

8    he's gravely mentally ill.  He has a cocktail, if you will, of

9    medications that he's required to take.  He has compliance

10   issues.  And because of that combination -- of his illnesses,

11   the medication, the compliance issues -- there are other issues

12   which take the form of, you know, the self-hatred,

13   self-harming, wanting to end his life, and, of course, coerce

14   others and things like that.  All of this seems to be in one

15   way or another related to his illnesses.

16             Is there a residential facility option where he would

17   be confined to a facility where he could be evaluated, where he

18   could be medicated, and he could be there during the pendency

19   of this case?

20             **MS. CHANG:**    Your Honor, I am not -- I have not

21   personally looked into that.  I have not heard the defense

22   propose a particular one either, and so -- you know, I've

23   spoken with the AUSA.  This is a Southern District of Florida

24   case, and the Southern District of Florida is -- they're asking

25   me to seek detention.

1        THE COURT:    I'm certain.

2        MS. CHANG:    I'm making my arguments based on that.

3    But I'll confess I have not looked at that particular option.

4    I understand --

5        THE COURT:    I'll just ask pretrial.  Is -- is such an

6    option available?

7        THE PRETRIAL SERVICE OFFICER:    (Indiscernible.)

8        THE COURT:    So even if I were to order it, you don't

9    think you could implement it?

10        THE PRETRIAL SERVICE OFFICER:    (Indiscernible.)

11        THE COURT:    Okay.  All right.  Go ahead, Ms. Chang.

12        MS. CHANG:    Your Honor, bottom line is the nature and

13    seriousness of the offense, the weight of the circumstances,

14    essentially the defendant's history and characteristics, and

15    the nature and seriousness of the danger that he poses to the

16    victim, to the Jewish community, to the community at large, and

17    also to himself weigh in favor of detention, Your Honor.  For

18    that reason we do seek detention in this case.

19        THE COURT:    All right.  Mr. Lambert.

20        MR. LAMBERT:    Judge, as the Court's noted, there's no

21    dispute that he is mentally ill and severely mentally ill.  It

22    is a disease.  It's not something that he's chosen as a route

23    in life.  It's something that has happened to him.  All of his

24    manifestations are consistent with people similarly situated,

25    sadly.

1        I too had asked the State -- or, I'm sorry -- the

2    Government if there were any mental health facilities because I

3    think that would be far more appropriate.  I can tell the Court

4    that Hanson has been complimenting those that have been

5    overseeing him at the Orange County Jail for their kindness

6    because they have segregated him, basically, and he appreciated

7    that very much.  He said the beds are still hard, but they've

8    done everything they can to make it easier for him.

9        I know Stewart-Marchman was interested in keeping him

10   for as long as they could, but they also knew that the FBI

11   wanted him.  So I don't know.  I too am at, you know, a hurdle

12   I can't overcome.  I hate to see him in a facility where things

13   could happen that shouldn't happen and -- because of his

14   disease.  It is -- it is difficult.

15       His parents have worked so hard over all these

16   years --

17       **THE COURT:**   I see that.

18       **MR. LAMBERT:**    -- and his sister as well, and yet

19   they -- they aren't even considering walking away.  You heard

20   his mom's headed down here.

21       So I don't -- I'm perplexed.  I'm saddened because

22   this is a -- you know, not the norm, and I don't -- I don't

23   know what to propose to -- to the Court as I fear the

24   consequence of, you know, a detention at a criminal facility.

25       **THE COURT:**    All right.  Thank you.

1          Ms. Chang, anything in reply?

2          **MS. CHANG:**   No, Your Honor.

3          **THE COURT:**   All right.  So the issue to be determined

4    is whether or not I can set conditions for the defendant's

5    release.  It is the Government's burden to establish by a

6    preponderance of the evidence that I cannot set conditions

7    which will reasonably assure the defendant's appearance in

8    regard to future proceedings and to show by clear and

9    convincing evidence that I cannot set conditions which will

10   reasonably assure the safety of the community.

11          In regard to the first, I -- I don't think the

12   Government has met its burden.  I do think that the defendant

13   would appear with regard to future proceedings.

14          However, in regard to danger to the community, the

15   nature and circumstances of this particular offense, looking at

16   the facts, weighs against his release.  The weight of the

17   evidence weighs against his release.  The defendant's personal

18   history and characteristics weigh against his release, and the

19   nature and the seriousness of the danger that he poses to the

20   community is significant, and I don't think I can mitigate it

21   through the imposition of conditions.

22          I think the only possible helpful thing that I could

23   do would be to order that he be detained in a treatment

24   facility -- evaluated, treated, and not released.  I've been

25   told by Pretrial that that is not an available option, and that

1          would be the least restrictive alternative that I could

2          possibly impose.

3                  There's a variety of facts here that have all been

4          well and ably presented by counsel, but the events on

5          August 25th, including the fact that he went, made

6          arrangements, traveled specifically to try and coerce a victim,

7          the fact that in that context he was then utilizing a threat

8          against an entire community -- religious community is -- is

9          very concerning.  The prior hatred that he's expressed towards

10         that very same community is problematic.  His multiple

11         expressions of desire to end his life, his efforts to end his

12         own life, and, as matter of fact, when he was picked up on

13         August 27th, the fact that he said he wanted to end his life,

14         and the compliance issues that we have here in regard to

15         medication.

16                 I appreciate all the family's support.  I think that

17         they absolutely testified honestly.  I don't doubt for a second

18         their account of what they've been dealing with, and they've

19         done a tremendous job supporting this defendant, and it's a

20         good thing that he has that support.  But right now at this

21         stage I find I cannot set conditions for his release, and so

22         he'll be detained pending further proceedings in the Southern

23         District of Florida.

24                 Any reason why I shouldn't enter an order of removal

25         so all further proceedings will take place in the charging

1    district, Ms. Chang?

2                    **MS. CHANG:**   No, Your Honor.

3                    **THE COURT:**   All right.  Mr. Lambert?

4                    **UNKNOWN SPEAKER:**   Your Honor --

5                    **MR. LAMBERT:**   No, sir.

6                    **THE COURT:**   All right.  Mr. Lambert, I'm going to ask

7    you to just -- I can see that the family's upset.  The whole

8    scenario is upsetting, you know.  But if -- if you do want to

9    take a moment to confer with them, you -- you can do that.

10   I've already ruled, though.  All right?

11                   **MR. LAMBERT:**   Thank you.

12       (Pause in proceedings.)

13                   **THE COURT:**   Okay.  I'm just going to give Mr. Lambert

14   a moment to join us back here in court.

15       (Pause in proceedings.)

16                   **THE COURT:**   You can take him.  Thank you.

17       (Pause in proceedings.)

18                   **THE COURT:**   All right.  For the record, Ms. Anderson

19   has checked with Mr. Lambert.  He does not want to address

20   anything further with the Court.  We're adjourned.  You're

21   excused.  Thank you.

22       (Proceedings concluded at 11:49 A.M.)

23

24

25

1                                            ***

2                         **CERTIFICATE OF REPORTER**

3       I certify that the foregoing is a correct transcript of the
record of proceedings in the above-titled matter.

4

5       /s/Heather Jewett, RPR, FCRR        10/17/2019
          Heather Jewett, RPR, FCRR          Date

6       Federal Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25